UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DANIEL J. BISHOP,                     )
                                      )
        Plaintiff,                    )
                                      )
    vs.                               )        Case No. 4:09CV1795 CDP
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security,      )
                                      )
        Defendant.                    )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Daniel Bishop's application for

supplemental security income benefits under Title XVI of the Social Security Act,

42 U.S.C. §§ 1381 *et seq.* Bishop claims he is disabled because he suffers from

anxiety and affective (bipolar) disorders and from a variety of complications

stemming from a lower back injury. The Administrative Law Judge concluded

that Bishop is not disabled, however, and Bishop appeals that decision. Because I

conclude that the ALJ's decision is supported by substantial evidence, I will affirm

it.

## Procedural History

On July 16, 2008, Daniel Bishop filed the current application for

supplemental security income, alleging disability beginning on August 24, 2007.

The Social Security Administration denied Bishop's application on September 11, 2008, and a timely hearing request was filed. Bishop appeared and testified at a hearing held on February 10, 2009. The ALJ issued his opinion on March 2, 2009 upholding the denial of benefits. On August 28, 2009, the Appeals Council of the Social Security Administration denied Bishop's request for review. The ALJ's decision thus stands as the Commissioner's final determination. Bishop filed this appeal on October 28, 2009.

<u>Testimony Before the ALJ</u>

Bishop appeared before the ALJ and testified that he was forty years old at the time of the hearing, was 5'11" tall, and weighed 185 pounds. Bishop stated that he was married and lived with his spouse, but that he and his wife were currently homeless and living with a friend. Bishop dropped out of high school after completing the tenth grade and had never passed the General Educational Development (GED) test, but he could read, do simple arithmetic, and write. He had previously been incarcerated in Missouri state prison for several months for stealing a leather coat.

Bishop testified that he had previously worked in landscaping, construction, and manufacturing. He had also worked briefly as a cashier in a gas station. He was unable to work in 1997, 2003, and 2004 because he had surgery on both of his

knees.  Bishop testified that his last date of work was July 18, 2005, when he quit landscaping.

Bishop stated that he became disabled on August 24, 2007, when he was diagnosed as being bipolar.  He described his impairments as including depression, bipolar disorder, and lower back pain.  For his depression, he took Celexa once a day in the morning, which helped him with his symptoms.  Bishop testified that he took Serequel at morning and night for his bipolar disorder, and that the Serequel helped him some.  He also testified to taking Valium three times a day.  The stresses of everyday life, including the placement of his children in state custody, caused him depression, anxiety, and panic attacks that caused him to pass out.  Bishop also testified that he had difficulty concentrating for long periods of time and could not remember to do things like taking his medications and keeping his appointments.  His medications helped him, however.

Bishop next testified that his lower back problems, including bulging discs, caused him pain, but that steroid injections and percocet helped him.  His side effects included sleepiness.  According to Bishop, his physicians had recommended surgery for his lower back.  He stated that he had surgery on both of his knees, and they both felt "80 percent or normal."  Bishop also testified that he could lift around thirty pounds, but that he could only spend about two hours per day walking, standing, and sitting.  He stated that he had to lie down for most of

the day because of his lower back pain.  He testified that his wife did most of the driving, shopping, and house work for him.  Although Bishop had stated that he could mow the lawn and walk a half mile at the time he initially filed for disability, he testified at the hearing that he was no longer able to do those things, and that sitting at the hearing caused him pain of an eight or nine on a one-to-ten scale.

Bishop's one hobby was playing video games with his children, although he was only able to see them for four hours a week during supervised visits.  Bishop stated that he smoked a half a pack of cigarettes a day, although his physicians had told him to quit.  He also admitted to being addicted to marijuana, having smoked it every day for thirty years before quitting in October of 2008 so that he could see his children.

The ALJ called a vocational expert, Jeffrey McGrowsky, Ph.D., who had been provided with and reviewed Bishop's file, including his past work history. McGrowsky testified that most of Bishop's previous jobs had involved heavy physical labor, and that Bishop had not acquired any specific transferable skills that could be used in other jobs.  The ALJ described a hypothetical individual to McGrowsky with the same education, training, and work experience as Bishop, and who could: lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and walk six hours out of eight; sit six hours out of eight; never

climb ropes; occasionally stoop, kneel, and crouch; avoid concentrated exposure to vibrations; adapt to routine and simple work changes; perform repetitive work according to set procedures, sequence, or pace; and not work in settings involving constant and regular contact with the general public. The ALJ then asked McGrowsky whether this individual could perform any of Bishop's previous jobs, and McGrowsky testified that he could not. McGrowsky added, however, that there were other light, unskilled jobs available in significant numbers in the national and Missouri economies that this individual could perform, including packing, assembly work, and bagging garments.

The ALJ then changed the hypothetical person to include the same limitations and abilities, but added that this person: needed a sit/stand option and the ability to change positions frequently; could understand, remember, and carry out simple instructions and non-detailed tasks; could maintain concentration and attention for two hour segments over an eight-hour period; could make simple decisions; and could respond appropriately to supervisors and co-workers in a task-oriented environment where contact with others was casual and infrequent and never involved contact with the general public. The ALJ asked McGrowsky if this individual could perform the same light, unskilled jobs as described by McGrowsky in answering the ALJ's first hypothetical, and McGrowsky testified that he could.

Finally, the ALJ asked McGrowsky whether an individual with the same limitations as Bishop described his own – including the need to lie down for most of the day – could perform any of the light, unskilled jobs. McGrowsky testified that such an individual could not perform any of those jobs. Bishop's attorney then described a hypothetical individual with the same mental limitations as described by the ALJ, but including a poor ability or inability to: interact with supervisors, deal with work stress, function independently, behave in an emotionally stable manner, and relate predictably in social situations. He asked McGrowsky if such an individual could perform the light, unskilled jobs, and McGrowsky testified he could not.

Medical Records

The medical records reveal that Bishop injured his lower back in 2005 and now suffers from lower back pain that radiates down his right leg, causing numbness and tingling. He also suffers from depression, mood swings, and anxiety.

Lower Back Pain

On November of 2006, physicians at Kirkwood MRI & Imaging performed a magnetic resonance imaging (MRI) study of Bishop's lumbar spine, because of

Bishop's radiculopathy[1] in his right leg.  The MRI revealed disc dessication (drying) without loss of disc space height and minimal disc bulging at L3-4.  At L4-5, the MRI revealed prominent disc bulging and end plate changes, with a left-lateral osteophytic component and a left-greater-than-right foraminal encroachment.  Finally, some mild underlying developmental spinal stenosis, or narrowing, was observed, but there was no thecal sac compression.

On March 17, 2008, Bishop sought treatment for his lower back pain at the Advanced Pain Center.  He complained of shock-like, shooting pain in his lumbar region and right lower extremity, as well as numbness and tingling in his entire right lower extremity.  Bishop stated that his usual pain level was nine on a scale of one to ten, was severe and constant, and interfered with his sleep.  He also stated, however, that his functional impairment was moderate, and his pain only interfered with some of his daily activities.  The medical records from that day also reveal that Bishop was taking several medications for his pain, including Celecoxib, Celexa, Gabapentin, Hydrocodone-Acetaminophen, Ibuprofen, Klonopin, Tizanidine, and Valium.

Bishop returned to the Advanced Pain Center on April 18, 2008, and was treated by Abdul Naushad, M.D.  Bishop complained of lower back pain with

---

[1]Radiculitis is the inflammation of portions of the spinal nerve root.  *See Stedman's Medical Dictionary* 1308 (25th ed. 1990)

numbness and tingling in his left fourth and fifth toes. His pain level was nine, but it only interfered with some of his daily activities. Dr. Naushad evaluated Bishop's lower back and noted severe tenderness at L4, moderate tenderness at L5, and mild tenderness off the midline in a symmetrical distribution. He also noted Bishop's lumbar spondylosis (stiffening of the vertebra) and radiculitis. Upon examination, Dr. Naushad observed that Bishop had a full range of motion without pain and normal muscle strength, reflexes, and sensation. Based on these observations, Dr. Naushad concluded that Bishop should continue with the present treatment plan, including Bishop's current medications, and should also limit his lifting to fifteen to twenty pounds and should not squat, kneel, climb, twist, or engage in any other activities that might cause his knees to lock. Finally, Dr. Naushad noted that Bishop was doing better in his daily activities, and that Bishop's pain medications helped with his pain and improved his daily functioning and sleep. He also scheduled Bishop for a lumbar epidural steroid injection on April 23, 2008.

Bishop received his injection as scheduled on April 23, and next visited the Advanced Pain Center on May 16, 2008. He reported that the injection had given him "good relief" from his pain. Similar to his other visits, Bishop complained that his pain was severe, but that it only interfered with some of his daily activities. He also stated that he had no severe side effects from his medications.

Dr. Naushad noted that Bishop was doing a "lot better" with the activities of daily living, and that his pain medications helped with his pain and improved his daily functioning and sleep. Dr. Naushad also noted that Bishop was searching for a surgeon who accepted Medicaid to perform surgery on his lower back.

On June 16, 2008, Bishop returned to the Advanced Pain Center, complaining of the same pain in his lower back and right extremity, along with numbness and tingling in his right leg. Dr. Naushad observed moderate tenderness at the L4 and L5 levels, and diffusely moderate tenderness off of Bishop's midline, but noted that Bishop had a full range of motion without pain. He concluded that Bishop should continue with the same medications and placed the same restrictions on him – no lifting over twenty pounds, and no squatting, kneeling, or climbing. Because Bishop had such success with his last injection, Dr. Naushad scheduled him for another on July 12, 2008. However, this injection had to be rescheduled because Bishop had a tooth abscess in July.

Bishop again visited the Advanced Pain Center on August 11, 2008, reporting pain, numbness, and tingling. Dr. Naushad examined Bishop and observed severe tenderness at L4 and L5 along with moderate tenderness off Bishop's midline. Dr. Naushad also noted that Bishop had a full range of motion without pain and normal muscle strength, reflexes, and sensation. Dr. Naushad placed the same restrictions on Bishop as before, and rescheduled him for a steroid

injection. Finally, Dr. Naushad refilled Bishop's hydrocodone prescription, and added Lyrica, Lidoderm, Tramadol, and Zanaflex.

On September 3, 2008, Xiaohui Fan, M.D., another physician at the Advanced Pain Center, administered the second steroid injection. However, Bishop returned to the Center on September 8, 2008, because the injection did not provide him much relief. He complained of the same pain, numbness, and tingling; and stated that some of his medications caused him nausea. Dr. Fan observed moderate tenderness at L4 and L5 and off Bishop's midline, but noted Bishop had a full range of motion without pain. Like Dr. Naushad, Dr. Fan limited Bishop to lifting only fifteen to twenty pounds and prohibited him from squatting, kneeling, climbing, twisting, or doing any other activity that might cause his knees to lock. Dr. Fan noted that Bishop's pain medications helped his pain, daily functioning, and sleep.

Bishop received another steroid injection on September 17, 2008. He returned to the Center on October 6, 2008, reporting that the injection had helped his back pain and his sleep, but that he had pain mainly in his right leg that day. Dr. Fan examined Bishop and noted that Bishop had moderate tenderness off of his midline and had back and leg pain when he raised his right leg. Based on these observations, Dr. Fan determined that Bishop should continue with his same restrictions and medications. Bishop received another steroid injection on October

22, 2008.  Before the procedure, he reported that his previous injection on September 17 had improved his pain by eighty percent.  Bishop next returned to the Center on November 3, 2008, complaining of pain in his lower back and right hip, leg, and toes.  He stated that his pain had improved since his last injection, however.  Dr. Fan placed the same restrictions on Bishop's physical activities and prescribed him the same medications.  Bishop had similar complaints on December 1, 2008, and Dr. Fan found moderate tenderness at L4 and L5, but severe tenderness off of Bishop's midline.  Raising his right leg caused Bishop pain, but Dr. Fan noted that Bishop had an active range of motion and normal muscle strength.  He placed the same physical restrictions on Bishop and prescribed him the same medications, noting that the medications helped Bishop's pain and improved his daily functioning and sleep.

When Bishop visited the Center on December 15, 2008, he complained that he had increased lower back pain and right lower extremity pain since he heard a "pop" in his back in early December. He also reported that his sleeping and mobility had decreased.  Dr. Fan observed that Bishop had mild tenderness off of his midline and weak muscle strength in his right foot caused by his lower back pain.  However, Dr. Fan noted that Bishop had an active range of motion.  Dr. Fan placed the same restrictions on Bishop's physical activities as before and noted

that Bishop may need another injection in 2009, as his last injection had helped his pain "a lot."

A second MRI study of Bishop's lower back was performed on December 22, 2009. This MRI revealed an annual tear, disc bulge, mild joint disease, and mild stenosis at L3-4. An annular tear and disc bulge were also found at L4-5, along with a superimposed central and right paracentral disc protrusion, which narrowed the right lateral recess. Moderate foraminal narrowing was also observed at L4-L5, although no significant central canal stenosis was observed. Finally, a central disc protrusion was present at L5-S1 along with mild bilateral neural foraminal narrowing. Spondylosis was most pronounced at L3-4, L4-5, and L5-S1.

After his second MRI, Bishop returned to the Advanced Pain Center on January 5, 2009, complaining of lower back and right leg and foot pain. However, Bishop stated that his pain was better than it was two weeks before. Dr. Fan noted Bishop had moderate tenderness off of his midline, and placed the same physical restrictions on Bishop as before. Dr. Fan also adjusted Bishop's medications to help improve his pain. Finally, on February 2, 2009, Bishop returned once more to the Center complaining of the same lower back and right leg pain. Dr. Fan observed mild tenderness in Bishop's entire lumbar spine and moderate tenderness off of Bishop's midline. Bishop also had an active range of motion. Dr. Fan

adjusted Bishop's medications and placed the same restrictions on him.  He

indicated that Bishop should possibly be scheduled for another steroid injection

sometime in 2009, because his previous injections had helped him a lot.  Dr. Fan

also noted "surgical consult" per Bishop's request, but that Bishop was waiting to

see if he received disability benefits.

### Depression and Anxiety

Medical records indicate Bishop met with Janet Murdick, APRN, at

Advanced Psychiatric Services on December 17, 2007.  Nurse Murdick noted

Bishop's personal history and his symptoms, including depression, mood swings,

and lack of energy.  She also noted that Bishop had no suicidal thoughts or

hallucinations and was sleeping fairly well, although he sometimes woke at night

feeling anxious and shaky.  Medical records from this day indicate that Bishop

was diagnosed with major depression and assessed a Global Assessment of

Functioning (GAF)[2] of 48.  Bishop returned to Advanced Psychiatric on January

24, 2008 and indicated that he was feeling better, that his mood swings and

irritability had both decreased, and that he was less depressed.  He reported that he

---

[2]"The GAF is a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning 'on a hypothetical continuum of mental health-illness.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 937 n.1 (8th Cir. 2009) (quoting the Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed. Am. Psychiatric Ass'n 1994) (DSM-IV)). GAF scores of 41-50 indicate that the individual has "[s]erious symptoms . . . or any serious impairment in social, occupational, or school functioning . . . . " DSM-IV at 32.

still suffered from some slight anxiety, but that he was sleeping fairly well. Bishop was prescribed Celexa and Valium along with other medications.

In March, Bishop reported once again that he was doing better. In particular, he had less agitation, no anger outbursts, fewer mood swings, less instability, and no depression or anxiety. Although he had pain in his lower back and down his leg, Bishop indicated he was going to physical therapy. His sleep was fair and his appetite was good. Nurse Murdick indicated that Bishop should continue with his medications and follow up with the office in four weeks. When Bishop returned on May 15, 2008, he reported one or two panic attacks in the past month and that he was depressed, but his wife also indicated that Bishop sometimes did not take his medications. Bishop also stated that he slept well with his medications, and his medications were adjusted.

On July, 10, 2008, Bishop reported a recent abscessed tooth that had been pulled, causing him a lot of anger and some panic attacks. He reported sleeping poorly, being more depressed, and not having much of an appetite. His medications were adjusted. Bishop returned on July 14 and reported that his sleeping had improved. His wife called the office on July 17 and indicated Bishop was doing fine on his medications. However, on July 31, his wife called once again and reported that Bishop had lost some of his medications, including his Serequel and Celexia, and had become upset over problems with his daughter.

Bishop was instructed to take his valium, and his other medications were refilled. Bishop next visited Advanced Psychiatric on August 7, 2008, indicating that he had one panic attack when his electricy was turned off, but that he was doing better. His prescriptions to Clonazepam, Valium, Serequel, and Celexa were refilled.

On August 29, 2008, Advanced Psychiatric received a call from a pharmacist requesting refills of Bishop's Valium and Clonazepam. However, medical records reveal that these requests were denied, because Bishop could not get any more refills until September 6, 2008. Bishop visited Advanced Psychiatric on September 8, 2008, indicating he had no depression or anxiety. Although he reported some mood swings and slight irritability, he had not had any panic attacks and his sleep was good. His medications were decreased. However, on November 10, 2008, Bishop reported that his children were taken from his home. He had one angry outburst, and was required to attend anger management classes. His medications were refilled and adjusted. He returned on December 8, 2008, indicating he was still having trouble with his children and that they were not living with him. He was angry with these circumstances, but reported that he was doing pretty well dealing with them. His prescription to Clonazepem was stopped, but his prescriptions to Valium, Celexa, and Serequel were refilled.

A Medical Assessment of Ability to do Work-Related Activities (Mental) was completed for Bishop on December 18, 2008. The form was signed by Nurse Murdick and another health care provider. The health care providers indicated that Bishop had poor to no ability to deal with the public, interact with supervisors, deal with work stresses, function independently, and maintain/attention concentration. They also noted he had poor to no ability to understand, remember, and carry out complex instructions and detailed, simple job instructions; to behave in an emotionally stable manner; and to relate predictably in social situations. His symptoms included depression, agitation, anxiety, anger outbursts, mood swings, poor memory, and inability to concentrate and comprehend.

By contrast, Marsha Toll, Psy. D., reviewed Bishop's medical records for a state agency in September of 2008, and noted that there was insufficient evidence to conclude that Bishop's affective and anxiety-related disorders disabled him. Specifically, Dr. Toll concluded that Bishop's mental impairments had not required emergency or inpatient-hospital care. She also noted that, although Bishop had a panic attack in August of 2008 when his electricity was turned off, he had later reported doing better.

<u>Other Evidence</u>

Bishop also presented evidence that he had a tooth abscess in the summer of 2008 which required surgery and hospitalization.  He also injured his right ankle in June of 2008 and required treatment at St. Anthony's, although an exmanination revealed no fracture or dislocation. In July of 2008, Bishop required treatment at St. Anthony's Urgent Care center for a second degree-burn on his hand after he burned it in a bonfire.

<u>Legal Standard</u>

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *id.*, or because the court would have decided the case differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a court considers both "evidence that detracts from the Commissioner's decision

as well as evidence that supports it." *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir.

2000) (internal citation omitted).

To determine whether the decision is supported by substantial evidence, the

Court is required to review the administrative record as a whole to consider:

(1)     the credibility findings made by the Administrative Law Judge;

(2)     the education, background, work history, and age of the claimant;

(3)     the medical evidence from treating and consulting physicians;

(4)     the plaintiff's subjective complaints relating to exertional and non-exertional impairments; and

(5)     any corroboration by third parties of the plaintiff's impairments; and

(6)     the testimony of vocational experts when required which is based on a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th

Cir. 1980).

Disability is defined in the social security regulations as the inability to

engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. § 416(i)(l); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. §§

404.1505(a) and 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the Commissioner must decide if the claimant engages in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform his past relevant work. If the claimant can perform his past relevant work, he is not disabled.

If the claimant cannot perform his past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner declares the claimant disabled. 20 C.F.R. §§ 404.1520 and 416.920.

When evaluating evidence of subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence. *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984). The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole. *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990). In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir.1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1.      the claimant's daily activities;
>
> 2.      the duration, frequency, and intensity of the pain;
>
> 3.      precipitating and aggravating factors;
>
> 4.      dosage, effectiveness and side effects of medication;
>
> 5.      functional restrictions.

*Id.* at 1322.

## The ALJ's Findings

The ALJ found that Bishop does not suffer from a disability within the meaning of the Social Security Act at any time through the date of his decision. He issued the following specific findings:

1.     Bishop has not engaged in substantial gainful activity at any time relevant to the ALJ's decision.  20 C.F.R. §§ 416.920(b) and 416.971.

2.     Bishop has the following severe impairments: anxiety-related disorder, affective (bipolar) disorder, and a back disorder.  20 C.F.R. § 416.920(c).  Additionally, the ALJ determined that Bishop's mental impairments place mild to moderate restrictions in his daily life activities; and cause him mild to moderate difficulties with maintaining social functioning, concentration, persistence, and pace.  However, these impairments have not caused Bishop any episodes of extended decomposition.

3.     Bishop does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4.     Bishop has the residual functional capacity to do the following: occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; sit and stand for an eight-hour workday if given the option to frequently alternate between sitting and standing; occasionally stoop, kneel, and crouch; understand, remember, and carry out at least simple instructions and non-detailed tasks; maintain concentration and attention for two-hour segments over an eight-hour period; demonstrate adequate judgment to make simple work-related decisions; and respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent.  Finally, the ALJ determined Bishop should not work in a setting with constant or regular contact with the general public, and should never climb ropes.

5.     Bishop is unable to perform any past relevant work.  20 C.F.R. § 416.965.

6.     Bishop was born on December 22, 1968 and was 39 years old on the alleged disability onset date, which is defined as a younger individual age 18-44.  20 C.F.R. § 416.963.

7.     Bishop has a limited education and is able to communicate in English.  20 C.F.R. § 416.964.

8.      Transferability of job skills is not material to the determination of disability due to Bishop's age.  20 C.F.R. § 416.968.

9.      Considering Bishop's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Bishop can perform.  20 C.F.R. §§ 416.960(c) and 416.966.

10.     Bishop has not been under a "disability," as defined in the Social Security Act, at any time through the date of the ALJ's decision.  20 C.F.R. § 416.920(g).

The ALJ concluded that, although there was evidence of an underlying impairment that could reasonably cause some of Bishop's symptoms, the medical records and other evidence did not support Bishop's claims of disabling symptoms and limitations – including Bishop's alleged need to lie down for most hours of the day.  In making this determination, the ALJ gave substantial weight to the findings and opinions of Bishop's treating and examining physicians, and to the opinions Dr. Toll.  However, the ALJ did not give any weight to the Medical Assessment of Ability to do Work-Related Activities (Mental), concluding that the extreme limitations described in this assessment were not supported by the record as a whole.  After reviewing the medical records, the ALJ also concluded Bishop's claims of disabling pain and mental impairments were belied by his lack of hospitalization or surgery for his symptoms; his reported daily life activities, including mowing the lawn, shopping, paying bills, and playing with his children; and by his demeanor at the hearing, which revealed that Bishop could understand

and answer questions and remain seated for a prolonged period of time without obvious signs of significant pain.

## Discussion

When reviewing a denial of Social Security benefits, a court cannot reverse an ALJ's decision simply because the court may have reached a different outcome, or because substantial evidence might support a different outcome. *Jones ex rel. Morris v. Barnhard*, 315 F.3d 974, 977 (8th Cir. 2003); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Instead, the court's task is a narrow one: to determine whether there is substantial evidence on the record as a whole to support the ALJ's decision. 42 U.S.C. § 405(g); *Estes v. Barnhard*, 275 F.3d 722, 724 (8th Cir. 2002). Here, Bishop raises several challenges to the the ALJ's decision, but they all essentially boil down to the argument that the ALJ's RFC determination is not supported by substantial medical evidence. I disagree.

A claimant's residual functional capacity is what he can still do despite his physical or mental limitations. 20 C.F.R. pt. 404.1545(a); *Lauer v. Apfel*, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). Although the ALJ is not limited to considering only medical evidence in making this assessment, the ALJ is "required to consider at least some supporting evidence from a professional," because a

claimant's residual functional capacity is a medical question. *Lauer*, 245 F.3d at 704.

When considering professionals' opinions in determining the claimant's RFC, the ALJ must defer to a treating physician's opinions about the nature and severity of a claimant's impairments, "including symptoms, diagnosis, and prognosis, what an applicant is capable of doing despite the impairment, and the resulting restrictions." *Ellis v. Barnhard*, 392 F.3d 988, 995 (8th Cir. 2005) (citing 20 C.F.R. pt. 404(a)(2)). A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record. *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). While a treating physician's opinion is usually entitled to great weight, the Eighth Circuit has cautioned that it "does not automatically control, since the record must be evaluated as a whole." *Bentley v. Shalala*, 52 F.3d 784, 785-86 (8th Cir. 1995). After reviewing the record as a whole, an ALJ may discount or disregard a treating physician's opinion if other medical assessments are supported by better or more thorough medical evidence, or where a treating physician gives inconsistent opinions that undermine the credibility of the opinions. *E.g., Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).

Here, the ALJ determined Bishop has the residual functional capacity to: occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; sit and stand for an eight-hour workday if given the option to frequently alternate between sitting and standing; occasionally stoop, kneel, and crouch; understand, remember, and carry out simple instructions and non-detailed tasks; maintain concentration and attention for two-hour segments over an eight-hour period; demonstrate adequate judgment to make simple, work-related decisions; and respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and infrequent. Additionally, the ALJ found that Bishop should not work in a setting that required constant or regular contact with the general public, and should never climb ropes. In his briefs, Bishop argues that this RFC fails to account for his actual physical and mental limitations. I will consider each in turn.

Mental Limitations

Bishop first claims the RFC should also include all the limitations as described in his Medical Assessment of Ability to Do Work-Related Activities (Mental), including his poor ability or inability to: interact with supervisors, deal with work stress, function independently, behave in an emotionally stable manner, and relate predictably in social situations. The ALJ rejected these limitations because they were "not supported by the record as a whole." I agree. The medical

records from Advanced Psychiatric Services indicate that, despite suffering from occasional depression, anxiety, and mood swings, Bishop is able to function fairly well in his daily life activities when he receives treatment and takes his medications. Although Bishop sometimes reported a few panic attacks and angry outbursts, as well as some depression, he also frequently reported that he was doing better, sleeping well, and had no depression or anxiety. He also reported doing well on medication, and his relapses usually arose after he stopped taking his medications. For instance, Bishop reported one or two panic attacks in the past month when he visited Advanced Psychiatric on May 15, 2008, but his wife also indicated that he sometimes did not take his medications. Bishop's medical records also indicate Bishop was able to cope well with serious and stressful life events, including the loss of his children to state custody. Indeed, Nurse Murdick's notes from December 6, 2008 indicate that Bishop was doing pretty well considering the circumstances of possible criminal charges and his inability to visit his children as frequently as he would like.

Rather than indicating that Bishop had poor or no ability to deal with work stress, function independently, or behave in an emotionally stable manner, these records indicate Bishop could handle stress reasonably well when taking his medications and receiving treatment. Given the inconsistencies between the extreme limitations described in the Mental Health Assessment form and Bishop's

limitations as described in his medical records, the ALJ did not err by disregarding the opinions described in the Mental Health Assessment form. *See, e.g., Prosch*, 201 F.3d at 1013.

Bishop's other arguments similarly fail. Bishop takes issue with the ALJ's conclusion that Nurse Murdick filled out this form and gave these opinions alone, because, he claims, the evidence also indicates that Dr. Co filled out the form as well. Bishop refers to the fact that the Mental Assessment form contains two signatures – Nurse Murdick's and another health care provider's. Below the second signature, Dr. Co's name is printed clearly, but, as the ALJ noted, the signature above Dr. Co's printed name is indecipherable, so it is difficult to determine whether Dr. Co really signed the sheet. However, even if the ALJ erred by concluding that Dr. Co did not fill out this form, that err is harmless. As discussed above, the opinions in the Mental Health Assessment form were inconsistent with the rest of the medical evidence, so the ALJ did not err in disregarding them, whether given by a medical doctor or a nurse.

Bishop next argues that the ALJ erred by giving substantial weight to Dr. Toll's opinions. The ALJ determined her opinion was entitled to substantial weight because she was a highly qualified physician and an expert in the evaluation of medical issues under the Social Security Act. Bishop seems to take issue with the fact that Dr. Toll was not a treating or examining physician, and so

argues that her opinions are not entitled to such weight. However, ALJs are entitled to rely on the opinions of consulting physicians when the physicians are experts in Social Security disability evaluations, as Dr. Toll was in this case. *See* 20 C.F.R. § 416.927(f)(2)(I); Social Security Ruling 96-6p. Moreover, Dr. Toll's conclusions were consistent with the medical record as a whole, which reveal that Bishop manages fairly well in his daily life activities despite his mental health problems, and that he has not been hospitalized. Thus, the ALJ did not err in giving these opinions greater weight than those of his examining sources.

Finally, Bishop challenges the ALJ's failure to discuss certain portions of the medical record, including the records from most of his visits to Advanced Psychiatric in 2008. Although an ALJ is required to develop the record fully and fairly, he need not "discuss every piece of evidence submitted," and his "failure to cite specific evidence does not indicate that such evidence was not considered." *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) (internal citations omitted). Indeed, the ALJ accounted for this evidence by determining Bishop's RFC included the ability only to interact with co-workers and supervisors infrequently. This conclusion is supported by the medical records, which reveal Bishop's anxiety and mood swings, but also his ability to handle stress fairly well.

For all of these reasons, the ALJ's RFC determination with respect to Bishop's mental limitations was supported by substantial evidence, and I must affirm it.

<u>Physical Limitations</u>

Bishop next claims the ALJ erred by failing to account for Bishop's need to lie down for most of the day in the RFC. In support of this argument, Bishop cites the medical records indicating his severe lower back and right leg pain, and that he received several steroid injections for his pain. He also claims the medical records reveal that he has adverse side effects to his pain medication, and needs back surgery. After reviewing all of the evidence, including the medical records and Bishop's own statements, I conclude that substantial evidence supports the ALJ's RFC determination with respect to Bishop's physical limitations.

Medical Records indicate that Bishop suffers from pain in his lower back and right leg stemming from disc bulges at L3-L4 and at L4-L5, and a disc protrusion at L5-S1. MRIs studies from 2006 and 2008 also reveal that Bishop has lumbar spondylosis, or stiffening of his lumbar spine. However, records from the Advanced Pain Center indicate that Bishop's pain is lessened and his functioning in daily life is improved with treatment and pain medications, including the steroid injections. Moreover, although Bishop often reported severe pain while receiving treatment at the Center, his physicians' examinations

frequently revealed only mild or moderate pain in his lumbar spine and a full and active range of motion. For instance, in February of 2009 – two months after his second MRI revealed increased disc bulging and stenosis in Bishop's lumbar spine than seen in the 2006 MRI – Dr. Fan noted after inspecting Bishop's lower back that Bishop had only mild tenderness in his entire lumbar spine and moderate tenderness off of his midline. Although Bishop had restricted flexion and extension and weakened muscle strength in his right leg and foot, Dr. Fan also noted that Bishop had an active range of motion.

Most importantly, although Dr. Fan had the results of Bishop's 2008 MRI, he did not change any of the restrictions placed on Bishop's activities. Indeed, these restrictions remain the same in all of the medical records from the Advanced Pain Center: no frequent lifting over 15-20 pounds; no squatting, kneeling, or climbing; and avoid twisting activities that might cause his knees to give way. Tellingly, these restrictions never include the requirement that Bishop lie down for most hours of the day. Bishop's chief complaint with the ALJ's RFC determination is the omission of any requirement that Bishop lie down for most of the time, but there is no evidence in the record before me support the inclusion of such a requirement, aside from Bishop's own testimony. In the absence of any medical records supporting this claim, I cannot conclude that the ALJ's RFC determination was flawed. Additionally, the RFC incorporated restrictions for

which there was substantial evidence, including the restriction that Bishop lift no more than fifteen to twenty pounds occasionally.

Additionally, I cannot conclude that the ALJ incorrectly discounted Bishop's allegations of pain. As described above, Bishop frequently complained of shooting and severe pain, but his physicians' examinations of his lower back mostly revealed moderate or mild tenderness and a full range of motion. The medical records also indicate that Bishop's pain medications, including percocet and steroid injections, helped him "a lot" with his pain.

Bishop's other claims also fail. Contrary to his assertions, the medical records from the Advanced Pain Center indicate no major side effects from Bishop's pain medications. Instead, the records indicate that Bishop frequently reported no side effects, and that Bishop's physicians adjusted his medications any time he indicated some side effects from medication. Indeed, Bishop himself testified at the hearing before the ALJ that his only side effect from medication was sleepiness. Finally, his allegation that his physicians required him to have surgery is not supported by substantial evidence. Bishop's medical records do indicate that he requested a surgical consultation – "surgical consult per his request" – but nowhere in the medical records is there any indication that his physicians recommended that he have surgery.

Thus, just as with the ALJ's RFC determination with respect to Bishop's mental limitations, the ALJ's RFC determination with respect to his physical limitations is supported by substantial evidence. No evidence, aside from Bishop's testimony, supports his assertion that he needs to lie down for most of the day, and the ALJ did not err by leaving this requirement out of the RFC. The decision should therefore be upheld.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed. A separate judgment in accordance with this Memorandum and Order is entered this same date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 31st day of January, 2011.